IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

MICHAEL DOUGLAS KUHN                                                        PLAINTIFF

v.            Civil No.   5:22-cv-05239-TLB-CDC

OFFICER KRISTOPHER MARTINEZ;
DEPUTY TRAVIS BILBREY; CORPORAL
KURT CORLEY; CORPORAL COLE SELF;
DEPUTY CHRISTOPER DRUMRIGHT;
SERGEANT BRAD MORGAN; CORPORAL
CODY REX; and DEPUTY ROBERT SMITH                                        DEFENDANTS

**REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE**

Plaintiff, Michael D. Kuhn ("Kuhn") filed this civil rights action pursuant to 42 U.S.C. § 1983.   Kuhn proceeds *in forma pauperis* and *pro se*.   Defendants have filed a Motion for Summary Judgment filed, and Kuhn has responded.   (ECF Nos. 18, 29, 35 & 40).   The Motion is ready for decision, and pursuant to the provisions of 28 U.S.C. §§ 636(b)(1) and (3), the Honorable Timothy L. Brooks, United States District Judge, referred this case to the undersigned for the purpose of making this Report and Recommendation on the Motion.

## I.        BACKGROUND

At the time Kuhn filed this action, he was incarcerated in the Washington County Detention Center (WCDC) as a pretrial detainee. (ECF No. 1 at 3).   Kuhn was booked into the WCDC on August 1, 2022.   (ECF No. 20-2 at 1).   Kuhn is currently an inmate in the Federal Correctional Institution in El Reno, Oklahoma.

Kuhn's first claim centers on the actions of Defendant Martinez on October 27, 2022. (ECF No. 20-8 at 30).   On that day, Defendant Martinez "put a metal scraper with a four or five-

1

inch razor" under Kuhn's cell door.  *Id.* at 31.  The scraper was pushed – with some difficulty because of the size of the handle – blade first under the door.  *Id.* at 32.  Kuhn was required to pull on it.  *Id.*  Once the scraper was in the cell, Kuhn said: "You're lucky I didn't cut myself with it."  *Id.*  According to Kuhn, Defendant Martinez responded that was why he was on the other side of the cell door.  *Id.*  He further said he was not "losing my job or getting hurt on the job here."  *Id.*

Kuhn was told the scraper was to remove the writing and items adhered to the walls.   (ECF No. 20-8 at 31).   Kuhn objected because he had only been responsible for one small area of writing concerning his daughter and her death.  *Id.* at 31 & 35.  Kuhn was told that if "you don't take the stuff off the wall, you're not going to get your commissary this week."  *Id.*  Kuhn instead asked for a "green scrubby."  *Id.*  Kuhn then testified Defendant Martinez said he would be back for the scraper in ten minutes.  *Id.*

When Defendant Martinez returned, Kuhn told Defendant Martinez that:

[y]ou're lucky I didn't cut my hand, cut myself with this thing, or do something stupid with it, and then you would have gotten sued by my family. . .. You can't be passing a metal scraper with a detachable razor—five-inch razor blade on it. . .. What if I decided not to give this back to you; what would you do?  Then you would have to come in this room . . . .   You shouldn't be passing this type of thing around to inmates.

(ECF No. 20-8 at 32-33).

By affidavit, Defendant Martinez indicates that prior to October 27, 2022, he had no issues with Kuhn and "found [him] to be easy to accommodate and get along with."  (ECF No. 20-9 at 1).   During the time frame in question, a detainee's access to commissary was limited if "their personal space was not clean."  *Id.*  Defendant Martinez says Kuhn asked for help because he had drawn on the wall and "wanted to remove it so he could have full access to commissary."  *Id.*

2

at 1-2.

Defendant Martinez brought Kuhn a "paint scraper and a sponge."   (ECF No. 20-9 at 2).
Defendant Martinez indicates he "stood there while [Kuhn] used it and immediately got the scraper
back from him."   *Id.* at 2.   While Defendant Martinez was at the door, Kuhn "did not threaten to
hurt himself with the scraper."   *Id.*   No one else was involved in the decision to give Kuhn a
scraper.   *Id.*   When he left at the end of his shift, Defendant Martinez did not know Kuhn had
submitted a grievance about being furnished with a scraper.   *Id.*

Kuhn submitted the following grievance on October 27, 2022:

AS DECENT AND TRUSTING SOMEONE GOES, IT WOULD HAVE BEEN A
BLOW TO THE COUNTY[']S FINANCES WHEN I SLIT M[Y] WRIST WITH
THE 4 INCH. RAZOR BLADED HANDLED SCRAPER MAR[TINEZ] JUST
GAVE ME TO CLEAN OFF THE MEM[]ORIAL I HAD ON THE WALL JUST
SO I WOULDN[']T GET MESSED WITH ANYMORE, SHE DIED MARCH
THIS YEAR AND HER BIRT[H]DAY IS THIS MONTH OCT. 30TH.   NICE
TOUCH, MY SON WOULD HAVE BEEN RICH.   SIGNED I SHOULD HAVE,
MIKE KUHN.

(ECF. No. 20-3 at 1).   Corporal Mulvaney responded he was unsure what Kuhn was grieving.
*Id.*   Kuhn responded that he thought his grievance was obvious – "not to pass 4 in. razors to the
typical inmate as a practice, [I] appreciate the trust, [I] just feel it[']s a saf[e]ty issue."   *Id.* at 2.
The grievance was closed without response.   *Id.*

Kuhn's second and third claims are based on his being placed in an isolation cell and the
conditions in that cell.   On October 28, 2022, Kuhn testified he was woken up by Defendant
Bilbrey and another officer, who might have been Defendant Self, and asked whether he was
suicidal.   (ECF No. 20-8 at 41).   Kuhn denied being suicidal.   *Id.*   When he was on his hour out
of his cell, Kuhn was asked why the officers had been in his cell.   *Id.*   Kuhn responded: "They're
asking me if I was suicidal."   *Id.*   One of the same guards, who Kuhn believes was Defendant

Bilbrey, heard Kuhn say the word suicidal and scowled.   *Id.* 41 & 48.   Kuhn told the guard he was just repeating what happened in his cell with the guards.   *Id.* at 41.   Kuhn believes Defendant Bilbrey reported his interaction with the other inmate to his superior.   *Id.* at 46.   Kuhn believes he was put into isolation because of "whatever [Defendant Bilbrey] said to them."   *Id.*

A short time later, Defendant Self and a "bunch" of other guards came, and Kuhn was asked to step outside the cell block.   (ECF No. 20-8 at 42).   Defendant Self stated he needed to know if Kuhn was suicidal or having suicidal thoughts.   *Id.*   Kuhn objected to being asked this yet another time and again denied being suicidal.   *Id.*   Kuhn was asked to come around the corner and told to enter an isolation cell.   *Id.*   Defendant Self indicated he was concerned about Kuhn being suicidal.   *Id.*   Kuhn stated he was not suicidal.   *Id.*

Kuhn believes Defendant Bilbrey had "something to do with putting me in that room." (ECF No. 20-8 at 45).   Kuhn believes he was placed in isolation in retaliation for having made Defendant Martinez look "stupid" for having put the scraper under the door.   *Id.* at 83.   In fact, Kuhn indicates Defendant Martinez told him that putting in the grievance "was a bullshit move." *Id.*   According to Kuhn, Defendant Bilbrey stated Kuhn was put in the isolation cell because of his complaint against Defendant Martinez.   *Id.* at 85.

Next, Kuhn was asked to undress and put on a suicide smock.   (ECF No. 20-8 at 43 & 50). He objected because a nurse and nurse practitioner were in the hallway with the pill cart.   *Id.* at 43. Defendant Self asked them to leave the area.   *Id.*   Kuhn remained in the isolation room from October 28, 2022, to October 31, 2022, because no medical or mental health personnel were on duty over the weekend.   *Id.* at 44 & 50.   Defendants Drumwright, Smith, and Corley all told Kuhn he would have to stay in the isolation cell until he was seen by Sheila Bryant ("Bryant").   *Id.* at

51.    When Kuhn was seen by Bryant, he denied being suicidal and said he "made a dumb comment because [Defendant Martinez] was stupid enough to put a razor blade under my door."  *Id.*   Kuhn explained that he was just trying to make the point that an inmate could have hurt himself with the razor blade or even killed himself if he was suicidal.   *Id.* at 52.   Kuhn was allowed out of isolation on October 31st after he signed a "no-harm contract."   *Id.*

There was no running water in the cell and Kuhn had to urinate and defecate in a drain in the floor.   (ECF No. 20-8 at 44).   On one occasion Kuhn was given an hour out and allowed to shower and use the toilet.   *Id.*   He was fed sandwiches for every meal but did receive three meals a day.   *Id.* at 44 & 71.   However, Kuhn states he was served outdated food.   *Id.* at 80.   Kuhn states his lunches were dated October 26th and he was in the isolation cell from the 28th to the 31st.   *Id.* at 81.   Kuhn believes the date written on the bag by kitchen staff was the expiration date.   *Id.*   With each meal, Kuhn indicates he received an eight-ounce cup of Kook-Aid.   *Id.* at 82.   He had no other access to fluids except on two occasions when he was given a cup of water.   *Id.*   The cell was usually swept and mopped by trustees after each meal.   *Id.* at 71-72.   Kuhn's requests to use the restroom were denied.   *Id.* at 65.

Kuhn testified there was "poop on the wall from where other people were in there and didn't have toilet paper and wiped their fingers all over the wall."   (ECF No. 20-8 at 87).   While Kuhn was in the isolation cell, no one washed down the walls.   *Id.*   Kuhn testified he had to sleep in there with the walls like that and walk on the floor with no shoes on.   *Id.*

Once, Kuhn recalled Defendant Martinez tossing his chips, sandwiches, and cookies into a bag and threatening to put the cup of Kool-Aid in the bag also.   (ECF No. 20-8 at 65).   Other officers objected and said it would get Kool-Aid over everything.   *Id.*   This is the reason Kuhn

alleged in his complaint that his lunch was sabotaged.   *Id.*   In Kuhn's words, Defendant Martinez "was trying to be malicious and the other officers stopped him."   Defendant Martinez gave Kuhn a different bag lunch and handed him the Kool-Aid separately.   *Id.* at 66.

Defendant Martinez also refused Kuhn's request to use the restroom at lunchtime.   (ECF No. 20-8 at 67).   Later that evening, Kuhn asked Defendant Drumright for an hour out, but his request was denied because Defendant Drumright was about to go off shift.   *Id.*   Kuhn was advised to ask somebody else to take him out but told him it probably would not be until midnight or 1:00 am.   *Id.*   When Kuhn asked an unidentified officer later that evening for his hour out, Kuhn was informed that he could not be taken out that night.   *Id.* at 68.   Kuhn indicates that the officer said he was not getting his hour out, concluding he had been lied to.   *Id.*   Kuhn requested and was given water.   *Id.*   Kuhn's request for toilet tissue was denied.   *Id.*   Kuhn was told he could not have toilet paper in the isolation cell.   *Id.*

Finally, Kuhn testified he had no choice but to defecate on the floor, using a sandwich bag to wipe, and then placed the defecation in a bag.   (ECF No. 20-8 at 69 & 73).   Kuhn told Defendant Smith when he brought Kuhn breakfast, and he asked him to wash his hands.   *Id.* at 72.   Defendant Smith was passing out breakfast and said he would not do anything until he was done serving.   *Id.* at 73.   Smith indicated he would come back and see what could be done for Kuhn.   *Id.* at 73-74.   However, Defendant Smith forgot and did not return until lunchtime.   *Id.* at 74-75.   Defendant Smith went upstairs to ask what could be done for Kuhn and returned saying he could not take Kuhn out of the cell then but did give him some with hand sanitizer.   *Id.* at 74-75.   Kuhn complained he still had "shit" on his hands.   *Id.* at 76.   *See also* (ECF No. 29 at 2) (Kuhn's statement of disputed facts – "I had poop stained hands and clothes").

Defendant Drumwright asked if there was "shit in that bag" and when Kuhn responded there was, Defendant Drumwright directed a trustee to dispose of it.   (ECF No. 20-8 at 69). Defendant Drumwright refused to allow Kuhn to use the restroom or to clean his hands.   *Id.* at 69-70.   Defendant Drumwright told Kuhn he would have to wait until he had been cleared by the by the "psych nurse."   *Id.* at 69 & 71.

Defendant Corley came to the cell and spoke with Kuhn when the psych nurse was there. (ECF No. 20-8 at 76).   Kuhn voiced his objections to having been kept in the cell over the weekend.   *Id.*   When Defendant Smith asked if Kuhn could be taken out of the cell, Defendant Corley stated they were just too busy at the time.   *Id.*   Kuhn asked Defendant Corley if he could be let out to use the restroom and his request was refused.   *Id.* at 80.   Kuhn believes Defendant Corley told other officers that they were too busy to allow Kuhn out of his cell and he would be allowed to clean up when he got out of isolation.   *Id.* at 79.

Kuhn felt he was being punished by being placed in a cell "for four days without running water and no toilet, like a prisoner or worse."   (ECF No. 20-8 at 78).   Kuhn stressed he was made to eat food without being able to wash his hands even after he was forced to defecate and wipe himself with a sandwich bag.   *Id.*

Kuhn named Defendant Morgan and Defendant Rex because they were superior officers. (ECF No. 20-8 at 92-93).   Kuhn testified they knew that detainees in isolation were "supposed to be allowed to be relieved and to be able to use the restrooms several times throughout the day." *Id.* at 93.

When asked about his official capacity claims, Kuhn indicated there was a widespread practice of placing inmates in isolation for no reason.   (ECF No. 20-8 at 62).   Kuhn states he was

aware this had happened to seven or eight people.  *Id.*  While Kuhn could recall portions of his conversations with some of the inmates, he could not recall the names of any of the inmates.  *Id.* at 63-64.

While Kuhn was in isolation, he suffered "mental stress from being shoved in a room like that and treated like a dog."  (ECF No. 20-8 at 91).  About a week after he was released from isolation, Kuhn developed a problem with his foot – "some type of athlete's foot or a fungus infection."  *Id.* at 87 & 92.   Kuhn was given three shots in his toe, a biopsy was taken, treated with steroids, and the skin was peeled off his foot five to seven times after which his foot was washed, soaked in hot water, and medicine put on it.  *Id.* at 88.   His foot was bleeding every day for two weeks to a month.  *Id.* at 92.   Kuhn believed the problem developed in November.  *Id.* at 88.   Kuhn stated the only time he walked around without shower shoes on was when he was in the isolation cell.  *Id.* at 89.   At the time Kuhn's deposition was taken, June 8, 2023, Kuhn testified he was still having the same problems with his feet.  *Id.*

According to Corporal Mulvaney, "[i]f an officer in the [WCDC] observes a detainee exhibiting signs of emotional instability o[r] psychological distress, the detainee shall be placed in a cell for observation, determined by the severity of the conduct."  (ECF No. 20-1 at 4). Detention officers are required to notify the shift sergeant or relief officer of any such observations. *Id.*   "If it is decided that a detainee may be suicidal the detainee shall be placed in an area where he/she can be constantly observed, and communication encouraged."  *Id.*   Any detainee with a "severe suicidal tendency" is to be confined to a padded cell, if one is available.  *Id.*   This type of separation of an inmate is referred to as administrative segregation.  *Id.* at 5.

Protocol suggests that staff should:

- Post a 15-minute watch.
- ALL clothes shall be removed and the detainee will be placed in the cell in a Suicide Smock.
- All water in the cell must be turned off; this includes the toilet.   This is only done if a padded cell is not available.
- Detainee should be fed on a soft tray.   No hard trays or eating utensils are ever to be placed in the cell.   The cup and plate are to be removed immediately after the detainee is finished eating.
- The Jail Administrator or their designee must approve any issue of items that are in the cell with detainee.   This includes blankets, towels, and any hygiene supplies.   At no time is there to be a toothbrush or a comb in the cell.
- The on-duty supervisor must be notified when moving a detainee that has been on suicide watch.

*Id.* at 4.

Corporal Mulvaney indicates it is the practice of the WCDC to notify jail medical staff when a detainee is placed on suicide watch.   (ECF No. 20-1 at 4-5).   "[T]he decision to remove the detainee from such observation should be made only by qualified medical staff, not by detention officers."   *Id.* at 5.

Cells and dayrooms are swept and mopped daily.   (ECF No. 20-1 at 5).   Walls and other surfaces are cleaned as necessary.   *Id.*

Cells do not generally have cameras inside.   (ECF No. 20-1 at 6).   However, for detainees in need of additional observation, the WCDC has "multiple isolation cells that are equipped with cameras inside the cells.   An officer monitors those several cameras and can alert other officers in case of an emergent need."   *Id.* at 6-7.

Because isolation cells may be used to observe and protect detainees who may be suicidal, the cells do not have fixtures such as toilets, sinks, or metal furnishings. The observation cells are constructed with the drain in the center of the cell so that if a detainee does relieve him or herself in the cell, the waste can be cleaned from the cell or can be flushed down the drain.

Detainees who are in isolation for suicide watch are generally not allowed out of the cell except when under surveillance of a detention officer for an approved purpose.

> If a detainee is in isolation for observation on suicide watch (requiring checks every fifteen minutes), they are provided water on request but are not allowed personal belongings to protect the detainee from using such things to injure themselves. Detainees on suicide watch can be provided an hour out daily when sufficient manpower is available to make sure that the detainee remains under observation, even while out of the cell, and when a bathroom/day room is not being used by inmates in that area.
>
> Isolation cells are cleaned by deputies daily and may be cleaned more than one time each day.   If there are feces or urine present in an isolation cell, that cell will be cleaned immediately.

*Id.* at 7.

The special status log report (the 15-minute watch) begins at 15:54:02 on October 28, 2022. (ECF No. 20-6 at 1).   The first entry is made by Defendant Bilbrey.   *Id.*   The log confirms that Kuhn received an hour out of his cell on October 29th beginning at 22:25:16. *Id*. at 19.   Kuhn's confinement to the cell ended on October 31st at 14:04:13. *Id*. at 50.

By affidavit, Defendant Self indicates he was not on shift on October 28, 2022, with Defendant Martinez.   (ECF No. 20-10 at 1).   During his shift, Defendant Self was the acting supervisor in A pod and was informed Kuhn had "made statements that were concerning about being sad and about cutting his wrists."   *Id.*   Although Defendant Self cannot recall how he first learned about it, he did recall Defendant Bilbrey telling him "[t]hat he had asked Kuhn about it, and he had denied it."   *Id.*   Later, Defendant Bilbrey reported that "he had heard Kuhn make another reference to 'suicide' when he was talking to another detainee."   *Id.*   Defendant Self decided to speak directly with Kuhn.   *Id.*   Kuhn "complained that Martinez, an officer on the previous shift had made him scrape a shrine to Kuhn's daughter off the wall.   Kuhn said that his daughter had died and that when Martinez gave him the scraper, he could have used it to cut his wrists."   *Id.*   Based on Kuhn's "statements about his deceased child and the fact that he said he

10

could have cut his wrists several times," Defendant Self made the decision to put Kuhn on suicide watch.   *Id.*   Defendant Self asserts his decision was based on his affirmative duty to protect Kuhn and the heightened risk of suicide in Kuhn's case based on his statements.   *Id.*   Defendant Self maintains he made the decision to place Kuhn on suicide watch without consulting anyone else. *Id.* at 3.   Defendant Self then called medical to advise staff that Kuhn had been placed on suicide watch.   *Id.*

Before Kuhn was moved to the isolation cell, Defendant Self "made sure that it was cleaned by trustees.   The trustees use disinfectant and a mop and deck brush to scrub the walls, bench, and floor and then mop it with water afterwards.   They then use dustmops to dry it."   (ECF No. 20-10 at 4).   Defendant Self saw the condition of the cell when he walked Kuhn in.   *Id.*   Defendant Self did not "observe any filth" or "any feces on the walls."   *Id.*

This was the last shift Defendant Self worked that weekend.   (ECF No. 20-10 at 3). Defendant Self did not speak to Kuhn again on October 28, 2022, or the remainder of the time he was in the isolation cell.   *Id.* at 4.

Once the decision was made to place Kuhn on suicide watch, only medical personnel could release him.   (ECF No. 20-10 at 3).   "It is the practice that a detainee placed on suicide watch is kept under watch for at least 24 hours before medical comes to evaluate the person for release or other treatment unless there is an urgent need for medical assistance."   *Id.*

According to Self,

[w]hen a detainee is on suicide watch, in order to take him/her out of the observation cell, two deputies will have to be pulled to take the detainee out of the cell and to another area where there is an available bathroom or shower.   The deputies will stay with the detainee the entire time they are out in order to protect them from hurting themselves.

(ECF No. 20-10 at 4).

Defendant Self indicates it was unlikely he saw Kuhn's grievance against Defendant Martinez as he had only access and authorization to answer requests, not grievances.   (ECF No. 20-10 at 3).   Defendant Self indicates he has no personal relationship with Defendant Martinez. *Id.*

By affidavit, Defendant Bilbrey states he was not on the same shift as Defendant Martinez in October of 2022; did not personally speak to him about Kuhn; has no personal relationship with him; and does not have access to grievances.   (ECF No. 20-11 at 1-2).   On the morning of October 28th, Defendant Bilbrey "was directed to go to Kuhn and speak to him to see if there was a problem or if he was possibly having thoughts of harming himself."   *Id.* at 2.

According to Defendant Bilbrey, during his training it was "made very clear to me that detention officers must always be aware of the risk of suicide in the jail because people in jail attempt to harm themselves at a higher rate than people who are not in jail."   (ECF No. 20-11 at 2).   If there are any signs that could be indicators of suicide, officers are to "quickly react by making sure they are under more regular observation to protect the detainee from being able to hurt themsel[ves]."   *Id.*

When Defendant Bilbrey spoke to Kuhn, "Kuhn advised he was not suicidal and that he was just mad when he made the comments about cutting his wrists."   (ECF No. 20-11 at 2). Defendant Bilbrey reported to his supervisor that Kuhn denied having suicidal thoughts.   *Id.* Sometime later, while Kuhn was out of his cell, Defendant Bilbrey overheard Kuhn speaking to another inmate and heard Kuhn use the word suicide.   *Id.*   This concerned Defendant Bilbrey, and he reported it to Defendant Self who then went with Defendant Bilbrey to speak to Kuhn.   *Id.*

According to Defendant Bilbrey, Kuhn admitted saying he could have hurt himself but denied being suicidal. *Id.* Defendant Self made the decision to put Kuhn on suicide watch. *Id.* Defendants Self and Bilbrey escorted Kuhn to cell ISO-2 and had him remove his clothes and provided him with a tamper-resistant smock to wear. *Id.* at 2-3. Defendant Bilbrey does not believe he had any other contact with Kuhn while he was in ISO-2. *Id.* at 3.

Defendant Morgan states he was not aware of Defendant Martinez providing Kuhn with a paint scraper on October 27, 2022, until sometime later. (ECF No. 20-12 at 1). While there is no policy prohibiting allowing a detainee to "use a scraper to clean something off of a cell wall, [Defendant Morgan] has not "witnessed that being done except in the situation of a detainee who is performing work service hours by painting or cleaning in the detention center under the supervision of a Deputy." *Id.*

Defendant Morgan asserts that he was not consulted or involved in the decision to place Kuhn on suicide watch. (ECF No. 20-12 at 2). However, he notes that "[o]fficers may disregard a detainee's statement that they are not suicidal if the officer believes that there is indeed a risk of self-injury." *Id.* Defendant Morgan states he did not speak to Kuhn between October 28 and October 31, 2022. *Id.* Defendant Morgan further indicates that if a detainee on suicide watch is moved from the observation room for any reason other than release the detainee should be accompanied by two deputies. *Id.* at 3. The necessary manpower must be available to take a detainee on suicide watch to the restroom or to shower and a secure bathroom must be available. *Id.*

With respect to the brown bag meals, Defendant Morgan states the date written on the bag is the date the meal was prepared – not an expiration date. (ECF No. 20-12 at 3). Defendant

Morgan also reiterates that the isolation cells are cleaned after each meal and after the release of a detainee.   *Id.* at 4.   Once the cleaning is complete, the "cell is checked and may be cleaned again before another detainee is moved into the cell."   *Id.*   Further, if an officer becomes aware of feces or urine being present, the cell "should be cleaned immediately."   *Id.*

Defendant Corley states he was on a different shift than Defendants Martinez, Bilbrey and Self.   (ECF No. 20-13 at 1).   He was not involved in the events of October 27-29, 2022.   *Id.* Defendant Corley first became aware that Kuhn was in the isolation cell when he came on shift on October 30th.   *Id.* at 2.   Defendant Corley believes he assisted in cleaning Kuhn's cell in the early morning hours of October 31, but does not otherwise recall any personal interaction with Kuhn. *Id.*

With respect to the ability to remove a detainee from the observation cell for a bathroom break, Defendant Corley indicates "a supervisor can only approve it when two deputies are available and when there is a bathroom available.   The detainee cannot be taken into a pod restroom if any other detainees are out or using the bathroom facility."   (ECF No. 20-13 at 2-3). Defendant Corley does not recall telling another officer not to take Kuhn to the bathroom; however, he notes that if it were during a time meals were being served, "it would have been difficult to pull two officers away from their other duties and to a find a bathroom not in use during mealtime." *Id.* at 3.   Defendant Corley did not "observe, believe, or understand that Kuhn had human waste on his hands."   *Id.*

Defendant Rex indicates that on October 28, 2022, he was on the shift that followed Defendant Martinez's.   (ECF No. 20-14 at 1).   On this date, Kuhn told Defendant Rex that he "had complained that DFC Martinez gave him a paint scraper and he could have slit his wrists with

14

it." *Id.*   Defendant Rex passed this information to others on his shift was but was not "involved in anything which followed." *Id.*   Defendant Rex indicates he did not speak to Kuhn after he was placed on suicide watch. *Id.*

Defendant Drumwright indicates his first involvement with Kuhn was on October 30, 2022, when he was working a few overtime hours. (ECF No. 22-1 at 1). Defendant Drumwright recalled bringing Kuhn first a bag meal and then his evening medication. *Id.* Defendant Drumwright does not recall Kuhn asking to be taken out of his cell; however, even if this occurred, there was a shortage of officers which was the reason Defendant Drumwright was working overtime. *Id.* Defendant Drumwright says he could not have taken Kuhn on an hour out that evening due to the shortage. *Id.*

Defendant Drumwright does not recall sending a trustee into Kuhn's cell to retrieve trash. (ECF No. 22-1 at 1). Defendant Drumwright indicates it is not his practice to send trustees into a cell with a detainee present. *Id.* at 1-2. Instead, Defendant Drumwright states he would "have had the detainee removed from the ISO cell and placed in a block with supervision while the trustees cleaned the cell." *Id.* at 2. If it is not possible to have a trustee clean the cell, a deputy cleans the cell after each meal. *Id.* Defendant Drumwright does not recall Kuhn asking to wash his hands. *Id.*

With respect to brown bag meals, Defendant Drumwright indicates that the date on the bag is the date prepared – not an expiration date. (ECF No. 22-1 at 2). Defendant Drumwright had no further interaction with Kuhn while he was on suicide watch. *Id.*

Defendant Smith indicates he was not present on October 27-28, 2022. (ECF No. 22-2 at 1). Defendant Smith recalls speaking to Kuhn when he asked for some hand sanitizer to clean his

15

hands.  *Id.*  After the supervisor consented, Defendant Smith gave Kuhn some hand sanitizer. *Id.*  Kuhn cleaned his hands and thanked Defendant Smith.  *Id.*  Defendant Smith does not recall "being asked by Kuhn to take him to wash his hands or shower."  *Id.* at 2.  With respect to the brown bag meals, Defendant Smith reiterates that the date on the bag was the preparation date. *Id.*  Defendant Smith had no other contact with Kuhn while he was on suicide watch.  *Id.*

**Video Files**[1]

Defendants have provided the Court with a flash drive containing multiple video files.[2] The first file is dated October 27, 2022.  It shows Defendant Martinez approaching Kuhn's cell, #22 on the upper tier, with a paint scraper in his hands.  Defendant Martinez then shoves the paint scraper under the cell door.  Defendant Martinez remains standing at the cell door until the scraper is returned to him.[3]

The remaining files cover sequential time periods during which Kuhn was housed in the isolation cell.  The isolation cell's dimensions are not provided.  It appears to be no more than eight by ten; however, one of the walls is angled inward towards the door reducing the available square footage.  (ISO2; 10-28-22; 1333-1730 hrs.).  Some type of substance is sprayed over the

---

[1] Kuhn was given several extensions of time due to his inability to view the video evidence at his unit of incarceration.  Eventually, working with Kuhn's counselor at the unit, the Court received confirmation that Kuhn had been able to view the video evidence – although Kuhn maintained the files were unhelpful or covered the wrong time periods.  (ECF No. 41).

[2] The files contain no audio.  The identities of the various officers depicted on the video files have been provided by Corporal Mulvaney – who is not a party to this lawsuit.  *See* (ECF No. 20-1 at 2-3).

[3] In his statement of disputed facts, Kuhn asks the Court to include two legal services file folders identified as #29960064 dated November 16, 2022, and #30063514 dated November 26, 2022, with his evidence.  (ECF No. 29 at 4).  However, Kuhn has not provided the Court with the file folders or stated where they could be found in the documents already submitted to the Court; nor does Kuhn indicate what evidence these files contain.

cement walls and floor.   *Id.*   The walls and floor are free of debris and appear to be clean – no

dark areas or discolored areas are apparent on the walls.   *Id.*   The area around the floor drain is

discolored.   *Id.*   On the cement bench, there appears to some discoloration in an approximately

straight line for 1/4th to 1/3rd of the length of the bench.   *Id.*   The cell has no sink or toilet.   *Id.*

There is a grate covered drain in the center of the floor.   The cell, when Kuhn first entered it, is

depicted below.



When Kuhn was placed in the cell, his clothes and shower shoes were taken.   (ISO2; 10-

28-22; 1333-1730 hrs.).[4]   Kuhn was not allowed to bring any personal belongings in the cell.   *Id.*

---

[4] The file identification is that contained on the flash drive provided to the Court as an exhibit.   It
is displayed both on the list of files and in the lower left-hand corner of the file as it plays.
References to specific times are to the number of minutes or hours into the file at which the given

He remained naked for approximately 22 minutes prior to being provided with a black smock with Velcro straps at the shoulders.   *Id.* (from 1:31 to 23:25). Kuhn has no mat, blanket, towel, or other items including hygiene items.

On the second file, Kuhn is provided with a brown bag lunch consisting of two sandwiches each containing a single slice of meat and cheese, chips that are loose in the bag, and what appear to be a couple of cookies and a slice of cake.   (ISO2; 10-28-22;1730-2130 hrs. at 2:01).   Kuhn is given a small Styrofoam cup containing a clear liquid; Kuhn testified in his deposition that the liquid was Kool-Aid.[5]   *Id.*   Kuhn is given his medication at the same time.   Kuhn places some remaining chips on the center drain and places his foot on the drain to push the chips through.   *Id.* When he is done eating, he also puts the brown paper bag and his cup on the drain.   *Id.*   A short while later, Kuhn moves the bag and cup aside and urinates in the drain.   *Id.*   (approximately 2:29).   The chips, cup, and bag remain on the drain.   *Id.*   Near the end of this file, Kuhn takes the paper bag, tears a piece off crumples it and leaves it on the drain.   *Id.* at 3:58:20. He takes the remainder of the bag, folds it, and puts it under his smock.   *Id.*

On the third file, Deputy Martinez and another unidentified deputy come in and sweep and mop the floor.   (ISO2; 10-28-22, 2130 to 10-29-22, 0100 hrs. at 19:21).   Other than Kuhn relieving himself, the remainder of this file Kuhn is either sleeping or attempting to sleep.

None of the video files appear to cover the time frame from 0100 to 0500 on October 29, 2022.   The next sequential file covers the time frame from 0500 to 0900 on October 29.   At 1:39, Kuhn is delivered a bag meal and a small cup of Kool-Aid by two deputies, neither of whom are defendants. (ISO2; 10-29-22;0500-0900 hrs.).   The meal appears to be the same as the one

---

event occurs.

[5] *See e.g.,* (ECF No. 20-8 at 65).

provided the night before – although Kuhn did not open the sandwiches, so the contents were not visible.  *Id.*   Kuhn again rips part of the brown paper bag off and keeps it.  *Id.*   Other than Kuhn urinating[6] in the center drain at approximately 3:02:24, nothing further of note occurs during this time frame.  *Id.*   The trash remains on the floor until the end of the video.  *Id.*

Between 0900 and 1300 hours on October 29, 2022, Kuhn is provided with another meal at approximately 3:06:34. (ISO2; 10-29-22; 0900-1300 hrs.).   He folds up the bag and keeps it. *Id.*   The trash from both meals remains on the floor.   *Id.*   Clearly, the time labels on these files are not correct or a small portion of the time frame is missing; the next file covers 1300-1700 hours on October 29 but, when it begins, the trash has been removed from the cell.   (ISO2; 10-29-22; 1300-1700 hrs.).   Nothing of note occurs during this time segment.   *Id.*   However, the next sequential file purporting to cover the hours 1700 to 2100 on October 29, begins with two cups and a partial paper bag on the floor drain.   (ISO2; 10-29-22; 1700-2100 hrs.).   As stated above, Kuhn was fed no meals during the video file allegedly depicting the hours between 1300 and 1700 and no trash was on the drain.   At 1:44:45, Defendant Martinez brings Kuhn a bag meal and a small cup of Kool-Aid.   *Id.* at 1:44:45. This time, Kuhn throws away one piece of bread.   *Id.*   He initially throws it on the center drain but then throws it toward the cell door.   At approximately 1:55, Kuhn dumps his remaining chips near the cell door and appears to be attempting to push them under the cell door.   *Id.*   Next, using his foot, Kuhn takes the garbage off the center drain and stuffs it partially under the cell door.   *Id.*   Kuhn also uses a portion of the paper bag to block the view from the opening in the cell door.   *Id.*   He later takes the partial bag down and adds it to his bags he is accumulating.   *Id.*   This is the third meal Kuhn has received since the cell has been

---

[6] The Court will not continue to make note of each time Kuhn relieves himself.

swept and mopped.  *Id.*  Deputy Martinez enters and sweeps the cell at 2:30:30. Id.  Another deputy mops the cell.  *Id.*  A few minutes later, a deputy enters the cell and gives Kuhn some medication.  *Id.*  Nothing else of note occurs.

The next file begins at 2100 on October 29 and continues until 0100 on October 30. (ISO2; 10-29-22 2100-10-30-22 0100 hrs.).  Approximately forty-six minutes into this file, two deputies open the door and Defendant Martinez brings Kuhn a small cup of water.  *Id.* at 45:52. At 1:20, the door was opened, and Defendant Martinez and another deputy allowed Kuhn to exit the cell.  *Id.* at 1:20:31. He remains outside the cell until 2:28.  *Id.* at 2:28:30.

Kuhn is sleeping or sitting on the bench throughout the file covering 0100 to 0500 on October 30, 2022.  (ISO; 10-30-22; 0100-0500 hrs.).  During the next sequential period, Kuhn is brought a meal at approximately 1:34:00.  (ISO2; 10-30-22; 0500-0900 hrs.).  As usual, the guards are in and out of the cell quickly – in this instance in 18 seconds.  *Id.*  At 2:27:12, Kuhn can be observed speaking to a deputy at the door.  *Id.*  The door opens at 2:31:42. Kuhn stands in the doorway for a few seconds, the door is closed, and he continues to speak with a deputy for a short time.  *Id.*  Nothing of note occurs during the next file until Kuhn is brought a meal at 3:23:03.  (ISO2; 10-30-22; 0900-1300 hrs.).  On this occasion, Kuhn throws two slices of the bread away and eats only a portion of a sandwich, apparently saving the rest for later.  *Id.*  Kuhn places the Styrofoam cups from his last two meals into the bags he has accumulated and makes a pillow.  *Id.*  Nothing of note occurs on the file covering 1300 to 1700 hours.  (ISO2; 10-30-22; 1300-1700).  Other than Kuhn being brought a meal by Defendant Drumwright at 1:48:28 and a cup of water and medication at 3:42:55, nothing else of note occurs during this time.  (ISO2; 10-30-22; 1700-2100 hrs.).

20

The next file covers the hours on from 2100 on October 30 to 0100 on October 31.   (ISO2; 10-30-22; 2100 TO 10-31-22 0100 hrs.).   At approximately 44:27, Kuhn defecates and then uses the paper bag, wipes, and attempts to push the waste through the grate on the floor drain.   *Id.* Kuhn uses a piece of bread to pick up the remaining waste and dirty bag, places it all into another bag, and puts the bag in the far corner of the cell near the door.   *Id.*   He later moves the bag back to the center drain – perhaps in hopes it will be seen.   *Id.*   The waste was removed from the cell at 1:52:36 when an unidentified deputy kicked the bag into the hallway.   *Id.*   The floor is not swept or mopped.   *Id.*   Kuhn is provided with a cup of water.   *Id.*   Kuhn appears to be asking to wash his hands, but the deputies merely close the door.   *Id.*   Nothing more of note occurs during this file.   From 0100 to 0500 hours on October 31, Kuhn is sleeping or sitting on the bench. (ISO2; 10-31-22; 0100-0500 hrs.).

During the file covering 0500 hours to 0900 hours on October 31, 2022, Kuhn begins using two of the Styrofoam cups as slippers.   (ISO2; 10-31-22; 0500-0900 hrs., at 1:16:22).   At 1:34:38, Kuhn is provided with a meal.   *Id.*   Kuhn again appears to be asking to wash his hands. *Id.*   The cell is swept by Defendant Corley at 3:27:58. Id.   What appears to be some type of cleaning solution is sprayed on a small portion of the cell floor on the left of the screen and then the floor is mopped.   *Id.*   On the next file, Kuhn is provided with meal at 3:54:19. (ISO2; 10-31-22; 0900-1300 hrs.).   Kuhn again gestures with his hands and appears to be asking to wash them. *Id.*   Kuhn does not begin eating his meal; a short time later, Defendant Smith enters the cell, speaks with Kuhn, and appears to have a small bottle of hand sanitizer with him.   *Id.* at 3:59:45.

The final file covers 1300 to 1512 hours on October 31, 2022.   (ISO2; 10-31-22; 1300-1512 hrs.).   At the beginning of the file, Deputy Smith can be seen putting some hand sanitizer

into Kuhn's hand. *Id.* at 0:00:06. Kuhn thoroughly uses the sanitizer and then eats his meal. *Id.* At 0:46:43, Defendant Smith mops the floor. *Id.* A short while later, Defendant Smith, another deputy, and Bryant come to the cell. *Id.* at 1:00:45. Bryant speaks with Kuhn for about a minute and a half and then hands him a "no harm contract[7]" which he signs. *Id.* at 1:01:50. Bryant exits the cell at 1:02:27. *Id.* Defendant Smith hands Kuhn a jail uniform at 1:03:16. Id. Kuhn immediately changes into the uniform. *Id.* At 2:11:32, Kuhn exits the cell. *Id.*

## II. LEGAL STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the non-moving party, the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *Nat'l Bank of Comm. v. Dow Chem. Co.*, 165 F.3d 602, 607 (8th Cir. 1999). A fact is "material" if it may "affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *Nat'l Bank*, 165 F.3d at 607 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion

---

[7] The date on no harm contract submitted as an exhibit is not clearly legible. (ECF No. 20-4 at 3). However, Bryant's notes reflect that Kuhn signed the no harm contract on October 31, 2022. *Id.* at 12.

is insufficient to survive a motion for summary judgment." *Id.* (citing *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### III.   DISCUSSION

In their Motion for Summary Judgment, Defendants argue (1) there was no personal involvement on the part of Defendants Morgan and Rex; (2) Kuhn was not retaliated against; (3) Kuhn was not denied due process while confined to the isolation cell for 3 days/72 hours; (4) Kuhn's recovery should be limited to nominal damages; (5) they are entitled to qualified immunity; and (6) there is no basis for official capacity liability.

Defendants regard the claims asserted against Defendant Martinez as being a single claim that he retaliated against Kuhn. *See* (ECF No. 19 at 5-9). Liberally construing Kuhn's allegations, the Court construes Kuhn's claims as also sounding in negligence and of being subjected to an unsafe environment.

### A.  Negligence

Kuhn's first claim is based on Defendant Martinez's providing him with a scraper with which he could have seriously injured himself. To state a § 1983 claim, Kuhn must allege that the Defendant while acting under color of state law deprived him of a right, privilege, or immunity secured by the constitution or the laws of the United States. *Hott v. Hennepin Cty., Minn.,* 260 F.3d 901, 905 (8th Cir. 2001). However, negligent conduct, or even grossly negligent conduct, does not state a claim under § 1983; the deprivation must be intentional. *Daniels v. Williams,* 474

U.S. 327 (1986); *Davidson v. Cannon,* 474 U.S. 344 (1986).   Therefore, to the extent that Kuhn contends Defendant Martinez was negligent in providing him with the scraper, Kuhn's claim fails. Defendant Martinez is entitled to summary judgment on any negligence theory of liability.

### B.  Failure to Provide a Safe Environment

The next possible construction of Kuhn's claim against Defendant Martinez is that he subjected Kuhn to an unsafe environment.   As Kuhn was a pretrial detainee, his claim must be analyzed under the Fourteenth Amendment which "guarantees pre-trial detainees at least as many protections as does the Eighth Amendment . . . and extends to them as well protection from deprivations that are intended to punish."   *Hott v. Hennepin Cty., MN,* 260 F.3d 901, 905 (8th Cir. 2001).   To prevail on a failure to protect claim, Kuhn must establish: (1) he was "incarcerated under conditions posing a substantial risk of serious harm," and (2) prison officials were "deliberately indifferent [to his] health or safety."   *See Holden v. Hirner*, 663 F.3d 336, 341 (8th Cir. 2011) (internal citations omitted).

The first prong is an objective requirement to ensure the deprivation of a constitutional right is sufficiently serious.   *Nelson v. Shuffman*, 603 F.3d 439, 446 (8th Cir. 2010).   "The deprivation is objectively, sufficiently serious, under the first requirement when the official's failure to protect resulted in the inmate being incarcerated under conditions posing a substantial risk of serious harm."   *Id*. (cleaned up).

The second prong, however, is subjective, requiring plaintiff to show the named official "both knew of and disregarded 'an excessive risk to inmate's health or safety.'"   *Holden*, 663 F.3d at 341 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).   "An official is deliberately indifferent if he or she actually knows of the substantial risk and fails to respond reasonably to it."

*Young v. Selk*, 508 F.3d 868, 873 (8th Cir. 2007).

Here, Kuhn was in a locked cell by himself when the scraper was passed to him.   The video establishes that Defendant Martinez stood outside the cell the entire time Kuhn was in possession of the scraper.   Kuhn maintains that he was not suicidal at the time and was not suicidal when he was placed on suicide watch.   On the record before the Court, there is no genuine issue of material fact as to whether Defendant Martinez subjected Kuhn to an unsafe environment and Defendant Martinez is entitled to judgment in his favor on this claim.   Further, having found that the facts do not make out a constitutional violation, Defendant Martinez is entitled to qualified immunity on this claim.   *See, e.g., Krout v. Goemmer*, 583 F.3d 557, 564 (8th Cir. 2009) (unless the facts make out a violation of a constitutional right the Defendant is entitled to qualified immunity).

### C.   Personal Involvement – Defendants Morgan and Rex

Defendants Morgan and Rex correctly argue they cannot be held liable under § 1983 absent a finding that they were personally involved in the alleged constitutional violations.   Liability under § 1983 requires personal involvement in the constitutional violations.   A plaintiff "must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."   *Ashcroft v. Iqbal*, 566 U.S. 662, 676 (2009); *see also Clemmons v. Armontrout*, 477 F.3d 962, 967 (8th Cir. 2007) ("Liability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights").

"[A] supervisor is not vicariously liable under 42 U.S.C. § 1983 for an employee's unconstitutional activity."   *White v. Holmes,* 21 F.3d 277, 280 (8th Cir. 1994).   Instead, "when supervisory liability is imposed, it is imposed against the supervisory official in his individual

25

capacity for his own culpable action or inaction in the training,[8] supervision,[9] or control of his subordinates." *Clay v. Conlee,* 815 F.2d 1164, 1170 (8th Cir. 1987).   The Court agrees that Kuhn has failed to allege any individual involvement of Defendants Morgan or Rex and has failed to allege any failure to train, or failure to supervise on their part, and thus, both are entitled to summary judgment in their favor.

### D.  Placement in the Isolation Cell

Kuhn contends he was placed in isolation in retaliation for filing a grievance against Defendant Martinez.   To state a retaliation claim, Kuhn must demonstrate that (1) he engaged in constitutionally protected activity, (2) that defendants responded with adverse action what would chill a person of ordinary firmness from continuing in the activity, and (3) that the adverse action was motivated at least in part by the exercise of protected activity.   *L.L. Nelson Enters, Inc. v. Cty. of St. Louis, Mo.,* 673 F.3d 799, 807-08 (8th Cir. 2012).   The causal connection is generally a jury question.   *Revels v. Vincenz,* 382 F.3d 870, 874 (8th Cir. 2004).

---

[8] The establish a failure to train claim, the failure to train must amount to deliberate indifference to the rights of the persons with whom the detention officers come into contact; and (2) the lack of training must have caused the constitutional deprivation. *Parrish v. Ball*, 594 F.3d 993, 1002 (8th Cir. 2010). Further, a supervisory officer is entitled to qualified immunity unless "a reasonable supervisor would have known that his training program (or lack thereof) was likely to result in the specific constitutional violation at issue.   Here, the summary judgment record shows at most that the detention center was understaffed, and the staffing shortage adversely impacted the officers' ability to remove Kuhn from the cell for hygiene purposes or otherwise.

[9] To establish liability for a failure to supervise, the plaintiff must show: (1) the supervisor received notice of a pattern of unconstitutional acts committed by subordinates; (2) the supervisor demonstrated deliberate indifference to or tacit authorization of the offensive acts; (3) the supervisor failed to take sufficient remedial action; and (4) the supervisor's failure proximately caused the plaintiff's constitutional deprivation.   *Parrish,* 594 F.3d at 1002.   The summary judgment record, viewed in the light most favorable to Kuhn, reveals nothing suggesting Defendants Morgan or Rex received any notice of a pattern of unconstitutional actions by their subordinates.

In a retaliatory transfer claim, "the [detainee] . . . face[s] a substantial burden in attempting to prove that the actual motivating factor for his transfer was the impermissible retaliation." *Goff v. Burton,* 7 F.3d 734, 737 (8th Cir. 1993) (cleaned up).   The detainee bears the burden of "prov[ing] that but for an unconstitutional, retaliatory motive the transfer would not have occurred." *Id.* at 738.   "This is a 'but for' test dealing with motive, not causation." *Sisneros v. Nix,* 95 F.3d 749, 752 (8th Cir. 1996).

The Court agrees with Defendants that there is no evidence that Defendants openly expressed a desire to punish Kuhn or to retaliate against him.   (ECF No. 19 at 12).   The Court also agrees that the record contains no evidence, other than Kuhn's supposition, suggesting that the decision to place him on suicide watch was reached because Kuhn had complained about Defendant Martinez giving him the scraper.   *Id.*   In their affidavits, the Defendants indicate they had not seen the grievance; had no personal relationship with Defendant Martinez; and some even agreed that, while it violated no specific policy, Defendant Martinez did not act prudently when he provided Kuhn with the scraper.   While Kuhn maintains he filed the grievance mentioning slitting his wrists merely to make a point about how unsafe it was to provide an inmate with a razor blade,[10]  the Court cannot say that the act of taking this statement seriously suggests any retaliatory motive by Defendants.

Further, based on the summary judgment record there is nothing, other than Kuhn's supposition, that anyone other than Defendant Self was involved in deciding whether Kuhn should be placed in isolation on suicide watch.   Defendant Self indicates he was initially told Kuhn had made "some statements that were concerning about being sad and about cutting his wrists."   (ECF

---

[10] Kuhn stresses that he repeatedly denied being suicidal.   (ECF No. 40 at 1).

No. 20-10 at 1-2).   Defendant Self states that when he spoke directly with Kuhn, he complained that Defendant Martinez made him "scrape a shrine" to his deceased daughter off the wall; Kuhn also indicated to Defendant Self that Kuhn could have used the scraper to cut his wrists.   *Id.* at 2.

While Kuhn says he denied being suicidal and was simply bringing the safety issue to the Defendants' attention, the Court cannot say Defendant Self erred when deciding to place Kuhn on suicide watch.   Kuhn testified he informed Defendant Martinez he was lucky Kuhn had not hurt himself and Kuhn submitted a grievance saying he could have slit his wrists and made his son rich. Then, according to Defendant Self, when he spoke with Kuhn, he mentioned his daughter's death more than once and said her birthday was October 30th and Kuhn was overheard mentioning the word suicide or suicidal to another inmate. (ECF No. 20-8 at 33, 36-37 & 41) (ECF No. 20-3 at 1); (ECF No. 20-11 at 2).[11]   Nothing in the record suggests that Defendant Self made the decision for retaliatory reasons and/or to punish Kuhn.   As no other defendant was involved in the decision, each of the Defendants are entitled to summary judgment on this claim.   The Defendants are also entitled to qualified immunity on this claim.   *See, e.g., Krout v. Goemmer*, 583 F.3d 557, 564 (8th Cir. 2009) (unless the facts make out a violation of a constitutional right the Defendant is entitled to qualified immunity).

### E.  Conditions of Confinement in the Isolation Cell

In *Stearns v. Inmate Servs. Corp., et al.,* 957 F.3d 902 (8th Cir. 2020), the Eighth Circuit discussed the applicable Fourteenth Amendment analysis for conditions of confinement claims brought by pretrial detainees.   The Eighth Circuit stated:

---

[11] Defendants have also presented evidence that on September 13, 2022, Kuhn asked to see the "psych nurse" due to depression and on October 7, 2022, asked to be evaluated.   (ECF No. 20-3 at 19 & 21).   However, there is no indication that Defendant Self was aware of these facts when he placed Kuhn on suicide watch.

> In *Bell v. Wolfish*, [441 U.S. 520 (1979)], the Supreme Court articulated the standard governing pretrial detainees' claims related to conditions of confinement. The Court held that the government may detain defendants pretrial and "may subject [them] to the restrictions and conditions of [a] detention facility so long as those conditions and restrictions do not amount to punishment, or otherwise violate the Constitution." *Id*. at 536-37. The Court articulated two ways to determine whether conditions rise to the level of punishment. A plaintiff could show that the conditions were intentionally punitive. *Id*. at 538. Alternatively, if there is no expressly demonstrated intent to punish, the plaintiff could also show that the conditions were not reasonably related to a legitimate governmental purpose or were excessive in relation to that purpose. *Id*. at 538-39. If conditions are found to be arbitrary or excessive, it is permissible to "infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees." *Id*. at 539.

*Stearns*, 957 F.3d at 907 (alterations in original) (citations to the S. Ct. omitted). The Due Process Clause is only implicated when a detainee is forced "to endure genuine privations and hardship over an extended period of time." *Bell,* 441 U.S. at 542.

In sum, the Constitution prohibits conditions that are intentionally punitive, are not reasonably related to a legitimate governmental purpose, or are excessive in relation to that purpose. *Stearns,* 957 F.3d at 907. The Court must determine, in the light most favorable to Kuhn, whether his conditions of confinement amounted to punishment. *Id.* at 908-09. Conditions of confinement that are related to legitimate government interests do not amount to punishment. *Bell,* 441 U.S. at 536-39.

To determine whether the conditions of confinement constitute punishment, the court considers the totality of the circumstances including the duration of confinement in the harsh conditions. *Stearns,* 957 F.3d at 909. (citing *Rhodes v. Chapman,* 452 U.S. 337, 347 (1981)). Detainees are entitled to reasonably adequate sanitation, personal hygiene, and laundry privileges, particularly over a lengthy course of time. *Owens v. Scott Cty. Jail,* 328 F.3d 1026, 1027 (8th Cir.

29

2003) (citing *Howard v. Adkison,* 887 F.2d 134, 137 (8th Cir. 1989)).

While in isolation, Kuhn was subjected to constant lighting; except on one occasion, he was denied soap, toothpaste, access running water or a toilet, and toilet paper; Kuhn had no towels or bedding, no change of clothing, socks or any type of foot wear; he had no personal items, writing or reading materials; he was fed the same brown bag meal three times a day; his cell was swept and mopped on an infrequent basis; he was only provided with a small cup of Kool-Aid three times a day at meal time and on three occasions (once on October 29 and twice on October 30) he was provided a small cup of water by guards;[12] with only two exceptions, he had no means of washing or sanitizing his hands before he ate or after he urinated or defecated; and he was forced to urinate and defecate on a grate covered drain in the center of the cell.

The Court concludes the cell was uncomfortable and the conditions under which Kuhn was held were demeaning and humiliating. While there are legitimate governmental interests in limiting in-cell access to any items, including hygiene items, with which the detainee could injure himself, it does necessarily follow that a detainee can almost completely be deprived of access to hygienic items and at the same time be subjected to the conditions in the isolation cell including the lack of available drinking water and the constant lighting, without it constituting punishment within the meaning of the Fourteenth Amendment.[13] *Cf. Green v. Baron,* 879 F.2d 305, 309 (8th

---

[12] Given the size or the cup depicted, the Court observes it can contain no more than 6 to 8 ounces of fluid.

[13] In the Eighth Amendment context, referenced in places by Defendants, the Supreme Court has held that "[s]ome conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise-for example, a low cell temperature at night combined with a failure to issue blankets." *Wilson v. Seiter,* 501 U.S. 294, 304 (1991) (citation omitted).   However, "[n]othing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific

Cir. 1989) (Eighth Amendment case – depriving a suicidal person of clothing and bedding does not violate the constitution – Court noting it "has not adopted an unconditional prohibition against deprivations of necessities) (citing *McMahon v. Beard,* 583 F.2d 172, 175 (5th Cir. 1978)).

While Defendants maintain Kuhn's claim fails because he was only subjected to these conditions for a mere 72 hours (a fact that weighs in Defendants' favor), the Court believes the apparent reason for the almost complete deprivation of hygiene weighs in Kuhn's favor.   Here, it appears the deprivations Kuhn suffered were almost entirely due to either a failure to schedule sufficient staff or a shortage of staff.   Defendants appear to agree that an inmate on suicide watch may be removed from the cell to use the restroom, shower, or have an hour outside the cell, provided that two deputies are available to supervise, and a restroom or shower is available.   It is also undisputed that Kuhn remained in the cell for as long as he did only because of a lack of available medical staff.   When Monday arrived, Bryant spoke to Kuhn for a mere 90 seconds, had Kuhn sign the no-harm contract, and cleared Kuhn to be released.

In other words, the deprivations Kuhn endured were in large part due to insufficient staffing rather than for a legitimate governmental purpose or any concern for Kuhn's well-being.   *Kinglsey v. Hendrickson,* 576 U.S. 389, 398 (2015) ("a pretrial detainee can prevail by providing . . . objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective"); *see also Karsjens v. Lourey,* 988 F.3d 1047, 1052 (8th Cir. 2021) ("In analyzing whether a condition of confinement is punitive, courts 'decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose.'") (quoting *Bell,* 441 U.S. at 538).

deprivation of single human need exists."   *Id.* at 305.

Defendants contend Kuhn suffered no resulting health effects or injury from the segregation on suicide watch.   Kuhn testified, however, that he developed a foot condition shortly after being released from the cell that resulted in significant necessary medical treatment.[14]   Kuhn maintains the only time he did not wear his shower shoes was during his stay in the isolation cell. While this does not necessarily prove causation, Defendants have presented nothing to suggest that the conditions in the isolation cell were not responsible for the foot infection.   Under the circumstances, the Court believes there is a genuine issue of material fact as to whether the conditions under which Kuhn was confined constituted punishment in violation the Fourteenth Amendment.   The Court's inquiry does not end here, however, because Defendants nevertheless maintain they are entitled to judgment in their favor on qualified immunity grounds.   This argument will be addressed below.

### (1).    Limitation on Damages

Defendants next argue that Kuhn is limited to the recovery of nominal damages under the Prison Litigation Reform Act (PLRA).   Section 1997e(e) provides as follows:   "No Federal civil action may be brought by a prisoner confined in jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e).   *See Royal v. Kautzky*, 375 F.3d 720, 723 (8th Cir. 2004).

While Defendants agree that Kuhn was not wearing socks or shoes inside the cell, they maintain he had very limited exposure to moisture which would have caused the infection.[15]

---

[14] On December 31, 2022, Kuhn asked that photographs be taken of his infected foot.   (ECF No. 20-3 at 23).   If photographs were taken, they were not presented to the Court.

[15] Defendants refer the Court to https://mayoclinic.org/diseases-conditions/symptoms-causes/syc-20353841 which states that "Athlete's foot (tinea pedis) is a fungal skin infection that usually begins between the toes.   It commonly occurs in people whose feet have become sweaty while

Because he suffered no actual injury, Defendants maintain Kuhn is limited to nominal damages.

It is clear Kuhn's foot or feet became infected.   Kuhn testified the infection started in early November, which was not long after his release.   Defendants have submitted nothing to dispute Kuhn's attribution of the infection to his time in the isolation room.   Rather, they merely rely on their allegation that he had little exposure to moisture while in the cell.   As the publication Defendants rely on indicates, there are other risk factors including contaminated floors which can cause a fungal infection.   While the floor was mopped, Defendants have not indicated what substance was on the mop head – clear water, disinfectant, etc.   Further, the video evidence reflects that the mop was merely swished around the cell a single time without being rinsed.

Defendants have produced no evidence showing when the infection was diagnosed as athlete's foot or any medical opinion as to the cause of the infection.   The medical entry on December 27, 2022, indicates that Kuhn complained the "cream for the sores on his left foot has not helped, bleeding/red/painful and oozes."   (ECF No. 20-4 at 13).   However, there appears to be no entry indicating when treatment began.   On December 31, Kuhn stated: "my right foot is destroyed and riddled with [athlete's] foot from filthy showers here."   *Id.* at 15.   Based on the allegations that the fungal infection was long lasting, resulted in frequent bleeding, required multiple shots and medication as well as debridement, the Court cannot say Kuhn suffered no injury.   While Kuhn may have difficulty proving the floor in the isolation cell was the cause of the infection, this is not a question the Court can answer based on the records before it.

---

confined to tight-fitting shoes."   This page also indicates the "condition is contagious and can be spread via contaminated floors, towels or clothing."   *Id.*   Under risk factors, the entry indicates you are at higher risk if you:   frequently wear enclosed footwear; sweat heavily; share mats, rug, bed linens, clothes or shoes with someone who has a fungal infection; or walk barefoot in public areas where infections can spread, such as locker rooms, saunas, swimming pools, communal baths and showers.   *Id.*

Defendants also argue Kuhn has provided no evidence sufficient to support his entitlement to punitive damages, and on this point, the Court agrees.  Punitive damages are awarded to "punish the defendants for his willful or malicious conduct and to deter others from similar behavior."  *Memphis Comm. Sch. Dist. V. Stachura,* 477 U.S. 299, 306 n.9 (1986).  "Punitve damages are appropriate in a § 1983 case 'when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifferent to the federally protected rights of others.'"  *Coleman v. Rahija,* 114 F.3d 778, 787 (8th Cir. 1997) (quoting *Walters v. Grossheim,* 990 F.2d 381, 385 (8th Cir. 1993) (internal quotation marks omitted).  No evidence has been presented from which a reasonable trier or fact could conclude that the Defendants acted with reckless or callous indifference to Kuhn's constitutional rights.

### (2).    Qualified Immunity

As mentioned above, Defendants assert they are entitled to judgment in their favor because the conditions under which Kuhn was confined did not violate clearly established Fourteenth Amendment law.  "Government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  "The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'"  *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 341-43 (1986)).

The qualified immunity inquiry consists of two questions: "(1) whether the facts alleged or shown, construed in the light most favorable to the Plaintiff, establish a violation of a constitutional

right; and (2) whether that constitutional right was clearly established as of the time of the relevant conduct such that a reasonable official would have known that his actions were unlawful." *Krout v. Goemmer*, 583 F.3d 557, 564 (8th Cir. 2009) (citation omitted). The Court can answer the questions in either order. *Pearson v. Callahan*, 555 U.S. 223, 242 (2009). A § 1983 plaintiff may defeat qualified immunity only if the answer to both questions is yes. *Boude v. City of Ramore*, 855 F.3d 930, 933 (8th Cir. 2017) (citation omitted).

As a pretrial detainee, Kuhn bears a lighter burden to establish the conditions of his confinement violated the Fourteenth Amendment than does a convicted inmate whose claim is analyzed under the deliberate indifference standard of the Eighth Amendment. *Stearns,* 957 F.3d at 906. Conditions amounting to punishment include "penalties that transgress today's broad and idealistic concepts of dignity, civilized standards, humanity, and decency" and "that deprive[] inmates of the minimal civilized measures of life's necessities." *Morris v. Zefferi,* 601 F.3d 805, 809 (8th Cir. 2010) (analyzing whether manner of transportation of detainee constituted punishment). The Court is also mindful of that the fact that Defendants have a duty to treat and supervise detainees and inmates who are at risk of suicide. *A.H. v. St. Louis Cty., MO,* 891 F.3d 721 (8th Cir. 2018) (analyzing claim that Defendants exhibited deliberate indifference to pretrial detainee's serious medical needs, which includes a risk of suicide).

In discussing when constitutional right is clearly established, the Eighth Circuit in *Perry v. Adams,* 993 F.3d 584 (8th Cir. 2021) stated:

> For qualified-immunity purposes, rights are not defined at a broad level of generality. Rather, for a right to have been clearly established at the time of the violation there must have existed circuit precedent that involves sufficiently similar facts to squarely govern [defendant's] conduct in the specific circumstances at issue, or, in the absence of binding precent, . . . a robust consensus of cases of persuasive authority constituting settled law. At the end of the day, qualified

immunity protects all but the plainly incompetent or those who knowingly violate the law, permitting liability only for the transgression of bright lines, not the violations that fall into gray areas.

*Id.* at 587 (citations and internal quotation marks omitted).

The undersigned has located no case on all fours with this one.   Nor is there a consensus in the case law that a reasonable detention official would know that Kuhn's conditions of confinement violated his constitutional rights.   *See e.g.,   Hall v. Ramsey Cty.,* 801 F.3d 912, 919-20 (8th Cir. 2015) (placing detainee in segregation for institutional security was a legitimate governmental objective and not impermissible punishment); *Hales v. Wakefield,* No. 4:22-cv-01078, 2023 WL 7019253, *2 (E.D. Ark. Oct. 25, 2023) (no constitutional violation where pretrial detainee, the aggressor in a fight, was placed in a holding cell for 4 days, when cell cleaned at least twice and detainee allowed to shower on the fourth day); *Mayfield v. Raymond,* No. 3:20-cv-03007, 2020 WL 7714715 at *17 (W.D. Ark. Dec. 29, 2020) (no constitutional violation where pretrial went six days without cleaning supplies and four days without a shower).   Rather, the conduct at issue in this case falls within the "gray areas" of the law.   Because the Court believes the conduct at issue in this case falls within the "gray areas," Defendants are entitled to qualified immunity on Kuhn's unconstitutional conditions of confinement claim.

### F.  Official Capacity Claim

"Section 1983 liability for a constitutional violation may attach to a municipality if the violation resulted from (1) an 'official municipal policy,' (2) an unofficial 'custom,' or (3) a deliberately indifferent failure to train or supervise."   *Corwin v. City of Independence, Mo.,* 829 F.3d 695, 699 (8th Cir. 2016) (citations omitted).

Kuhn does not contend any of the WCDC policies were unconstitutional.   Instead, he

appears to be trying to assert that there was a widespread custom of placing inmates in isolation as punishment and/or in conditions that amount to punishment.   While Kuhn alleges awareness of seven or eight instances where this has occurred, he presents no evidence to support his bald assertion.   *Snider v. City of Cape Girardeau,* 752 F.3d 1149, 1160 (8th Cir. 2014) (official custom requires the showing of (1) a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference or tacit authorization of such conduct by policymaking officials after notice to the officials of the misconduct; and (3) that plaintiff was injured acts taken pursuant to the custom).   Kuhn has not alleged the existence of a deliberately indifferent failure to train or supervise.   No official capacity claim exists, and Defendants are entitled to summary judgment on the official capacity claims.

## IV.   CONCLUSION

For these reasons, it is recommended that Defendants' Motion for Summary Judgment (ECF No. 18) be **GRANTED,** and this case be **DISMISSED WITH PREJUDICE**.

**The parties have fourteen (14) days from receipt of the Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).   The failure to file timely objections may result in waiver of the right to appeal questions of fact.   The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

RECOMMEND this 17th day of January 2024.

*Christy Comstock*
_____
CHRISTY COMSTOCK
UNITED STATES MAGISTRATE JUDGE

37